PEOPLE ex rel. BALCOM v. MOSHER et al.

(Supreme Court, Appellate Division, Third Department. November 15, 1899.)

CIVIL SERVICE OF CITIES—APPOINTMENTS FROM ELIGIBLE LISTS—POWER OF SELECTION.

The civil service amendment to the constitution (Const. art. 5, § 9), providing that appointments in the civil service of cities shall be made according to merit and fitness, to be ascertained, so far as practicable, by competitive examinations, was not intended to nullify the power of appointment which the legislature may, by article 10, § 2, vest in authorities of a city, and which contemplates the exercise of discretion as to whom shall be appointed, but limits the exercise of such power to persons whose fitness has been ascertained by examination, without requiring the absolute selection of the one who receives the highest percentage on such examination, in violation of the hitherto uniform rule of selection of one from the three graded highest; and hence Laws 1899, c. 370, and the civil service rules passed in pursuance thereof, in so far as they compel the appointment of the person graded highest on the proper eligible list, conflict with said article 10, § 2, Const., and nullify the power of appointment conferred thereby.

Landon, J.; dissenting.

Appeal from special term.

Application for mandamus by the people, on the relation of George N. Balcom, against William H. Mosher and others, constituting the board of street commissioners of the city of Binghamton, to compel them to appoint relator superintendent of streets and city property in said city. From an order granting a peremptory writ, respondents appeal. Reversed.

The charter of said city (section 5 of title 10 of chapter 214 of the laws of 1888) confers the power of appointment of a "superintendent of streets and city property" upon the board of street commissioners of said city, and provides that such appointment shall be made upon the second Tuesday in February in each alternate year. The position of superintendent of streets and city property became vacant February 1, 1899, by the expiration of the term of the then incumbent. Thereafter, and in the month of April, the municipal civil service commission, at the request of the board of street commissioners, certified to such board, for the office of "superintendent of streets and city property," the names of three persons appearing upon the eligible list prepared by said commission, as the result of an open, competitive examination for such position. The names so certified, and their standing, were as follows: Herbert T. Bolles, 96 $9/10$ per cent.; George N. Balcom, 89 $13/20$ per cent.; and John M. Seabury, 83⅕ per cent.; and the fact that the relator, George N. Balcom, and John M. Seabury are both honorably discharged soldiers from the army of the United States in the late Civil War, was certifiied to by such civil service commission. Rule 14 of the civil service rules of the city of Binghamton, approved by the mayor of such city in August, 1898, and by the state civil service commission September 7, 1898, provides that: "When any officer having the power of appointment to or employment in any position in Schedule B, so requests, the commission shall certify to him the names as soon as practicable of the three persons having the highest standing upon the eligible list. And the appointing officer shall thereupon appoint to the vacant position one of the three persons so certified to him." It is provided however, that such rule is subject to any and all of the laws of the state of New York in relation to honorably discharged soldiers or marines of the Civil War, giving them the preference under civil service rules. After the certification by the civil service commission to the board of street commissioners of the above-named persons, the board of street commissioners held several meetings at which resolutions were offered for the appointment of the relator, George N. Balcom, to the position of su-

perintendent of streets and city property, and also similar resolutions for the appointment of John M. Seabury. Each of such resolutions received two votes in the affirmative and two in the negative. Consequently there was a failure to appoint. The relator, both verbally and in writing, demanded his appointment to such position, and a resolution appointing him was offered, which received two votes in the affirmative and two in the negative, whereupon the relator made his application to the court for a writ of peremptory mandamus; and from the order granting it this appeal is taken.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

A. M. Sperry, for appellants.
Rollin W. Meeker, for respondent.

HERRICK, J. The contention of the relator is that, being a veteran, and having the highest percentage of the two veterans upon the eligible list, he is, as a matter of right, entitled to the appointment, pursuant to the constitution and the provisions of chapter 370 of the Laws of 1899. No contention is made but that veterans are subject to the civil service laws of the state, and that they are only entitled to preference after they have passed the required examinations and secured a place upon the eligible list, when they are entitled to a preference over civilians, no matter what their standing upon such eligible list may otherwise be. The question here is whether that provision of chapter 370 of the Laws of 1899, and of the civil service rules passed in pursuance thereof, providing for the appointment of the person graded highest on the proper eligible list, is in conflict with the constitution of the state. If it is, then the civil service rules of the city of Binghamton, above quoted, are in full force and effect, and the relator is not, as a matter of right, entitled to be appointed, but the defendants have power of selection or choice between the relator and the other veteran, John M. Seabury. If the law is constitutional, then such rules are to that extent repealed or nullified, and the defendants must appoint the relator, he being the highest in grade.

Section 9 of article 5 of the constitution provides that:

"Appointments and promotions in the civil service of the state, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness, to be ascertained so far as practicable, by examinations, which, so far as practicable, shall be competitive."

Section 13 of chapter 370 of the Laws of 1899 provides as follows:

"Appointments shall be made to or employment shall be given in all positions in the competitive class, that are not filled by promotion, reinstatement, transfer or reduction, under the provisions of this act and rule, and in pursuance thereto, by appointments of those graded highest in open, competitive examinations of the state or municipal commissions, except as herein otherwise provided."

Rule 8 of the state civil service rules, adopted under and pursuant to chapter 370 of the Laws of 1899, provides as follows:

"Appointments shall be made to or employment shall be given in all positions in the competitive class, that are not filled by promotion, reinstatement, transfer or reduction, under these rules, by the appointment or employment of the person graded highest on the proper eligible list, as the result of open competitive examinations, except as herein otherwise provided."

The statute and rule above cited are in harmony with section 9 of article 5 of the constitution, and, if we were to consider that section of the constitution alone, the question presented would be a very simple one. But pursuant to the rule of construction, hereafter more particularly adverted to, that all parts of the constitution must be considered together, and in relation to each other, we must examine the constitution, and see if there is any other portion of it that must be considered in connection with section 9, above referred to, before we can intelligently pass upon the question before us.

The office sought by the relator is a city office, and the constitution provides that:

"All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such city, town or village, or by some division thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose." Const. art. 10, § 2.

The legislature having selected a local authority, we must read that authority into the constitution. In this case, having selected the board of street commissioners, it is the same as if the constitution read:

"The superintendent of streets and city property, in the city of Binghamton, shall be appointed by the board of street commissioners."

For that purpose the board of street commissioners is a constitutional body vested with the power of appointment. The power of appointment implies a discretion in the appointing power, as to whom he shall appoint, and embraces, not only perfect liberty as to the person to be appointed, but the duty of personally investigating the character and qualifications of the proposed appointee, as to his fitness to discharge the services required of him. Menges v. City of Albany, 56 N. Y. 374; People v. Angle, 109 N. Y. 564–573, 17 N. E. 413. "The choice of a person for a civil office constitutes the essence of the appointment, and the selection must be the discretionary act of the officer clothed with the power of appointment." 19 Am. & Eng. Enc. Law (1st Ed.) p. 423, and cases cited. The power of appointment contemplates the exercise of judgment and discretion in the appointing power as to whom he shall appoint, and responsibility for the person so selected; and, to secure this, it must be the independent, untrammeled act of the appointing officer. Menges v. City of Albany, 56 N. Y. 374. "The officer clothed with the power of appointment must select the persons to be appointed. He may listen to the recommendation and advice of others, but the selection must finally be his act." People v. Fitzsimmons, 60 N. Y. 514–518. Choice or selection means the power to determine between two or more. No choice or selection can be made when there is no alternative. "Hobson's choice" was no selection. The legislature can undoubtedly take away the power of appointment, and confer it upon some other local authority. It can prescribe the term of office of the appointee, and his power and duties, and the formula of his appointment. But its power ceases then. : It cannot deprive the appointing power of the exercise of its discretion as to the personnel of the appointee. That is the essence of the power. "The legislature is expressly authorized to

designate the local authority who shall appoint the local officers, and it is impliedly prohibited from doing more than that, or from placing limitations upon this power of appointment. As it was said in People v. Draper, 15 N. Y. 544, every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision." Rathbone v. Wirth, 150 N. Y. 459–468, 45 N. E. 17; People v. Howland, 155 N. Y. 270–280, 49 N. E. 775.

The court of appeals, in the case of People v. Angle, 109 N. Y. 564–573, 17 N. E. 415, in speaking of the restrictions and limitations of the then existing civil service laws upon the power of appointment conferred upon the superintendent of public works by the constitution, said:

"Any provision of law * * * which materially interferes with the freedom of selection conferred upon the superintendent, and the exercises of his judgment in investigating and determining the fitness and the propriety of the contemplated appointment, seems to us not only in conflict with the terms of the constitution, but plainly to violate its spirit and intent."

And again:

"It seems to us that this law leaves to the superintendent only the barren office of issuing a commission to a person whom others have selected for his adoption, whereas the constitution provides that he shall be the exclusive actor in determining the wisdom and propriety of the proposed appointment." Menges v. City of Albany, 56 N. Y. 374.

And this was said in reference to then existing civil service laws, which permitted the superintendent or appointing officer to appoint any one of the three standing highest upon the eligible list. How much more forcible is it when applied to a law which leaves him no discretion, but compels him to take the one standing highest upon a list of candidates prepared by others! The power to appoint, without the power of saying who the appointee shall be, is a nominal, not a real, power. The person or persons who determine who the appointee shall be, constitute the real appointing power. It seems to me, therefore, that chapter 370 of the Laws of 1899 is in conflict with section 2 of article 10 of the constitution.

Thus far, I have considered section 2 of article 10, and section 9 of article 5, of the constitution, separate and apart from each other; and, as has been seen, the law in question appears to be in harmony with one, and in conflict with the other, section. We must therefore consider both together, in order to arrive at a correct construction. The fact that section 2 of article 10 was in the old constitution, and that section 9 of article 5 has been added by a subsequent amendment, makes no difference in the construction to be given to the constitution as a whole. "There is no repeal of the different parts of the fundamental law of the state, by implication, by the adoption of additional clauses; but the instrument as amended must be read as a whole, and as if every part had been adopted at the same time, and as one law, and effect must be given to every part of it, each clause explained and qualified by every other part." Judge Allen in the case of Railway Co. v. Anderson, 3 Abb. N. C. 434–452, approved in People v. Angle, 109 N. Y. 564–575, 17 N. E. 413. "The constitution, as it now exists, must be

read and considered in all its different parts; and each provision must be given its appropriate place in the system, and some office to perform, and at the same time all must be so construed as to operate harmoniously." People v. Roberts, 148 N. Y. 360–367, 42 N. E. 1084. "It is a familiar rule of construction that a statute should be construed so as to give effect, if possible, to all of its provisions; but in interpreting the constitution the rule is more rigidly applied, and the fundamental law, as solemnly expressed in the written instrument, is to be considered as a whole, complete in itself, and force and effect must be given to every provision contained in it." People v. Rathbone, 145 N. Y. 440, 40 N. E. 395; Smith v. Board, 148 N. Y. 187–189, 42 N. E. 592.

The civil service amendment to the constitution was undoubtedly intended as a limitation upon the power of appointment granted in other sections of the constitution, but it was not intended as a nullification of that power; and whenever that power is granted by the constitution, or the legislature is authorized to confer it, we must give the fullest effect to the section granting such power or authority that the civil service section will admit of, in order to give "each provision  *  *  *  its appropriate place in the system and some office to perform." Let us see, therefore, if effect cannot be given to both sections of the constitution, and if they cannot "be so construed as to operate harmoniously." To arrive at the true meaning of a statute or constitution, we must, if possible, ascertain the intention of the framers of such instrument. "The intention of the lawmakers is the law." Smythe v. Fiske, 23 Wall. 374–380. In endeavoring to ascertain the intentions of the lawmakers upon any given subject, the history of the times, and of such subject, and the laws and customs in relation thereto, if any exist, the proceedings of the lawmakers, and the evils intended to be corrected, and the good to be accomplished, must be considered. It is unnecessary at this time to recite the history of civil service reform in Great Britain, the United States, and in this state. It is familiar to us all, and has been repeatedly adverted to in the decisions of the court of appeals of this state and the decisions of our own court upon civil service questions. Suffice it to say at this time that after the passage of the civil service act in this state, in 1883, it was found that it was not applicable to two of the great departments of the state, and the intention of the framers of the amended constitution was to make all the apartments and political divisions of the state subject to its civil service laws. The proceedings in the convention in relation to this amendment, the address issued to the people, both of which are adverted to in the case of People v. Roberts, 91 Hun, 101, 34 N. Y. Supp. 641, 36 N. Y. Supp. 677, and 148 N. Y. 360, 42 N. E. 1082, show that the intention of the framers of this amendment was to extend the principle of civil service reform, so called, to every department of the state government. "The obvious purpose of this provision was to declare the principle upon which promotions and appointments in the public service should be made, to recognize in that instrument the principle of the existing statutes upon that subject, and establish merit

and fitness as the basis of such appointments or promotions, in place of their being made upon partisan or political grounds." People v. Lyman, 157 N. Y. 368–375, 52 N. E. 134. It seems to me that the question for us to determine is whether that principle requires the absolute selection of the one who receives the highest percentage upon such examination, and whether that is an essential requirement in the enforcement of the principle involved. That necessarily leads us somewhat into the history of so-called civil service reform. My first impression would be that the use of the word "competitive" would indicate that the man standing highest in the competition should receive the reward, but the expression does not seem to have been given such meaning in the past.

The movement for reform in the civil service, which culminated in the civil service statutes and rules and the amendment to the constitution, was intended to accomplish two things: First, to improve the qualifications of those holding subordinate positions in the public service; and, second, to eliminate, as far as practicable, the element of partisanship and personal favoritism in the appointments to such positions. The first (improvement in the qualifications) was to be accomplished by examinations conducted in the first instance by persons other than those having the power of appointment, and which examinations, when practicable, should be competitive. But those who successfully passed such examinations did not become, as matter of right, entitled to appointment. If they passed the prescribed minimum standard, they simply became eligible to appointment, and all who passed that standard became eligible. The relative degree of merit and fitness, so far as it could be ascertained by such an examination, was determined by the percentage each received, which fixed the position of each upon the so-called eligible list. This examination and position on the list was simply the basis. It was supplemented by the power of examination and inspection necessarily involved in the power of choice or selection vested in the appointing power or officer, and further supplemented by the so-called probationary appointment, or probationary period, which preceded a final appointment, during which time the candidate may be said to have been under a continuing practical examination. To accomplish the second purpose (the elimination of the element of partisanship and personal favoritism), the problem was, how far the law or rules should go in limiting the power of appointment. If it was restricted to designating the person at the top of the list, then all the benefit to be derived from a personal inspection and inquiries of and about the candidate, which are frequently so valuable, would be lost. Then, too, good service required that there should be some responsibility in the appointing officer; and it was recognized that power and responsibility go together, and that one cannot exist without the other, and that to compel the appointing officer to appoint the person adjudged by the civil service examiner to have passed the best examination was to deprive such appointing officer of all power, and relieve him of all responsibility, and practically to vest the power of appointment in the civil service examiners. Therefore the

course adopted was to restrict the appointing power to a selection from a limited number of those standing highest, as the result of the competitive examination; thus preserving some degree of power and responsibility, and limiting, so far as other requirements permitted, the opportunities for the exercise of partisanship or favoritism. See report of Silas W. Burt, hereinafter quoted. When the attempt was first made to reform the civil service in Great Britain, by requiring candidates to pass examinations, such examinations were held by the appointing officer, and were what was called "pass examinations." They were seemingly private examinations, corresponding to what is known under our system as "noncompetitive examinations," being taken by a single candidate. While this somewhat improved the character of the service, and brought in a somewhat better class of men, yet it did not prevent the appointing officer from distributing his patronage as part of the spoils of his office; and to limit that, and to insure strife among aspirants, which would result in a higher order of candidates, what was called the "open, competitive system" was adopted. See 1 Lalor, Cyc. Pol. Sc., article on the "Civil Service" by Dorman B. Eaton. But under the system then adopted there was no requirement that the one standing at the top of the list must be appointed. So, also, when the system was adopted in the United States service there was no such requirement, and the only limitation in that respect upon the appointing power was to require it to appoint one of the three standing highest upon the eligible list; and that is the law and rule in the United States service to-day. It is a familiar rule of construction, which I will again revert to, that the framers of constitutions and of statutes are presumed to have a knowledge of existing laws, and that the instruments that they frame and adopt, are framed and adopted in reference to such existing laws. "We must keep in mind that the constitution was not framed for a people entering into a political society for the first time, but for a community already organized, and furnished with legal and political institutions adapted to all, or nearly all, the purposes of civil government, and that it was not intended to abolish those institutions, except so far as they were found to be repugnant to the constitution then framed." People v. Draper, 15 N. Y. 537; Rathbone v. Wirth, 150 N. Y. 459–471, 45 N. E. 15. At the time of the adoption of the amendment to the constitution there was, and had been for a number of years, a statute of the state upon the same subject. The language of the constitution and of the prior existing statute relating to the civil service is very similar, and provides for substantially the same thing. The constitution provides that appointments and promotions in the civil service of the state, etc., "shall be made according to merit and fitness, to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive." The civil service act in force at the time the constitution was adopted (chapter 354 of the Laws of 1883) made it the duty of the governor, with the aid of the civil service commission, to prepare rules and regulations which shall provide, among other things:

"As nearly as the condition of good administration will warrant, * * * for open, competitive examinations for testing the fitness of applicants for the public service, now classified, or to be classified, hereunder." Section 2.

## Section 6 of such law provided that:

"Within four months after the expiration of the present session of the legislature it shall be the duty of the governor to cause to be arranged in classes all the several clerks or persons employed, or being in the public service, for the purpose of the examination herein provided for, and he shall include in one or more of such classes, so far as practicable, all subordinate places, clerks and officers in the public service of the state."

## Section 7 provided that:

"After the termination of eight months from the expiration of the present session of the legislature no officer or clerk shall be appointed, and no person shall be admitted to, or be promoted in, either of the said classes now existing, or that may be arranged hereunder pursuant to said rules, until he has passed an examination, or is shown to be specially exempted from such examination in conformity herewith."

The rules adopted pursuant to such statute, and as they existed when the amendment to the constitution was adopted, provided for two kinds of examinations,—competitive and noncompetitive. Rule 8 provided as follows:

"Appointments shall be made to or employment shall be given in the positions in Schedule B by selection from those persons graded highest, as the result of open, competitive examinations."

Schedule B was a list or statement of officers who could only be appointed after having passed a competitive examination. Rule 17 provided as follows:

"Whenever an officer having the power of appointment to or employment in any grade in Schedule B shall request a certification from which to make an appointment, the commission shall certify to him as follows: (1) When the names of three or more honorably discharged soldiers or sailors shall be on the eligible list, there shall be certified not more than two names in excess of the number of places to be filled; (2) when less than three names of honorably discharged soldiers or sailors appear on the eligible list then all such soldiers or sailors shall be certified together with the names of those persons, not exceeding two in number, who are graded highest on said eligible list; (3) in all cases, except as above, the commission shall certify the names of the three eligible persons who are graded highest on the proper register. * * * From the persons whose names are so certified the officer shall make selection to fill the vacant place, subject, however, to the provisions of law giving preference in appointment to certain persons." Report of Civil Service Commission, 1894, pp. 144, 147.

It will thus be seen that the practical construction of the laws requiring appointments to be made as the result of competitive examinations was not to compel the appointment of the person standing highest upon the list, as a result of such examination, but permitted the selection of one out of a limited number of those standing highest upon the list; thus permitting and allowing some degree of discretion in the appointing power or officer, and not robbing him of all discretion, by compelling him to take the one selected and designated as highest by the civil service examiners. There is nothing in the phraseology of section 9 of article 5 of the constitution that requires a different construction, or that makes the

result of the competitive examination controlling, to the extent of compelling the appointment of the persons receiving the highest percentage upon such examination.

In the case of People v. Lyman, 157 N. Y. 368–375, 52 N. E. 134, the court of appeals said:

"The extent to which examinations are to control is declared to be only so far as practicable. This language clearly implies that it is not entirely practicable to fully determine them in that way. It was the purpose of its framers to declare those two principles, and leave their application to the discretion of the legislature. As was said by the chairman of the committee to which this amendment was referred: 'It seemed best to the committee, after very careful and repeated consideration, to leave the application of the principle [of merit and fitness] to the good sense of the legislature,—the application of it.' Thus, it is apparent, not only upon the face of the provision itself, but from the debates in the constitutional convention, that the framers of this amendment did not intend to absolutely determine how the merit and fitness of appointees were to be ascertained and determined. The constitution provides that, to an extent, those questions are to be determined by an examination; but it is obvious that it was understood at that time that it would be impracticable to fully determine the merit and fitness of an employé or appointee by a mere examination, whether competitive or otherwise. It is to be observed that the provision of the constitution is that the merit and fitness of the applicant or appointee shall be ascertained in the manner stated, so far as practicable; that is, part, at least, if they can be even partially ascertained in that manner. The words 'so far as practicable' plainly relate to the degree or extent to which the examination should control. The provision is not that the examination shall be the basis of determining merit and fitness when or where or in such cases as it is practicable, but that in all cases they are to be ascertained by an examination, only so far as practicable. In other words, it does not declare that the examination shall control in ascertaining merit and fitness in any or all cases where it is practicable, but that the qualifications of the candidate shall be ascertained in each case by an examination to the extent and only so far as it is practicable, and consequently sufficient to insure the selection of proper and competent employés. The constitution plainly implies that other methods and tests are to be employed when necessary and calculated to fully ascertain the merit and fitness of the applicant."

And he concludes that one of the other methods or tests is that furnished by what is known as a "probationary appointment." But it is not decided or intimated that that is the only other method. And it is entirely in harmony with the construction so given by the court that something should be left to the appointing power,— some degree of discretion, some power of selection. The provision for probationary appointments alone does not solve the question presented. Under it the appointing officer has no discretion, no power of selection. He can dismiss the man he has been compelled to appoint, but he is immediately confronted with the same difficulty as before. He must take the next man standing highest upon the list. I am satisfied that the framers of the constitution had no such intent; that they did not intend to deprive the appointing power granted in other sections of the constitution of all discretion and power of selection; that they did not intend to absolutely nullify by one section what they granted in others, but simply to limit and regulate the exercise of such power according to the principles of then existing laws and rules, which "were well known and understood by the framers" of the constitution. People v. Roberts, supra. Neither the practice, as we have seen, under such

laws, nor the principle itself, requires that the appointing power shall be deprived of all power of selection, which means a choice between two or more. On the contrary, the propriety of permitting at least a limited discretion and power of selection has always been recognized.

Silas W. Burt, one of the earliest promoters and students of civil service reform in this country, and who has had many years' practical experience of the operations of civil service laws both in the United States and in the state of New York, of which state he has been a civil service commissioner for a number of years, in a report made by him to the governor of the state in 1897, speaking of the limitations of appointments from the eligible list, says:

"The primary principle of these rules was the limitation of appointment to the selection from the three persons standing highest upon an eligible list of those whose relative merit and fitness above a certain minimum standard had been ascertained by open, competitive examination held by the civil service commission. This limitation reduced the opportunities for favoritism to the lowest point deemed possible, since a restriction to the one person standing highest would annul the officer's discretion and responsibility for the appointment, while the three names gave a discretionary range that has by long trial been approved as sufficient, particularly since it was supplemented by appointment for a probationary period only before a permanent tenure was given." Report of the Civil Service Commission, 1897, p. 12.

This portion of Mr. Burt's report was cited with approval by Judge Martin, speaking for the court, in his opinion in the case of People v. Lyman, 157 N. Y. 369–379, 52 N. E. 132,—with special reference, however, to what was said in relation to probationary appointments; and in reference thereto he said:

"Therefore, when we consider the laws and civil service rules existing when the constitutional amendment was adopted, the position taken upon this subject by its friends and advocates, and the guarded language of limitation employed in the amendment, there would seem to be no doubt as to the purpose of the amendment, nor that it was intended to continue the hitherto uniform rule as to probationary trials."

The same reasoning would lead us to the conclusion that there can be no doubt that in adopting such amendment the framers of the constitution intended also to continue the hitherto uniform rule as to the selection of one from the three graded highest, and not to compel the appointment of the one highest upon the eligible list, and thus deprive the appointing authority of the very essence of the power elsewhere granted. Moreover, it has been repeatedly held that the civil service laws in force when the constitution was amended, and which did not confine the appointment to the one graded highest as the result of a competitive examination, and which left some discretion and freedom of selection in the appointing power, are in harmony with section 9 of article 5 of the constitution. In concluding his opinion in the case of People v. Lyman, Mr. Justice Martin, speaking for the court, said:

"We are of the opinion that the statute of 1883 and statutes amendatory thereof are still in force, and are not in conflict with the constitution."

In Re Sweeley, 12 Misc. Rep. 174–181, 33 N. Y. Supp. 373, it was said:

"The civil service law of the state, as it was prior to the adoption of the new constitution, is, with the exception of the acts passed relative to soldiers, in harmony with the constitution."

That case was affirmed without opinion in People v. Sweeley, 146 N. Y. 401, 42 N. E. 543, and the principle so enunciated was affirmed by the court of appeals in the cases of People v. Lyman, 157 N. Y. 368–375, 52 N. E. 132; People v. Roberts, 148 N. Y. 360, 42 N. E. 1082; and Chittenden v. Wurster, 152 N. Y. 345, 356–358, 46 N. E. 857.

Judge O'Brien, who wrote the prevailing opinion in the case of People v. Roberts, said:

"It is evident from the language of the new provision of the constitution, and from the debates in the convention which followed its introduction into that body, that it was framed and adopted with reference to existing laws which were intended to give to it immediate practical operation. So that in adopting the new constitution the people, in their original capacity, decreed that thereafter all the departments of the government should be brought within the operations of existing laws on the subject of appointments. The mandate to the legislature to enact laws to provide for the enforcement of the section does not in any degree conflict with those views. That was a proper and prudent, though perhaps an unnecessary, precaution. Moreover, when this constitutional provision was adopted, and when it was proposed in the convention, the statute and civil service rules to which we have adverted were in force, and were well known to and understood by the framers of that provision. Hence it is but reasonable to suppose that when it was proposed they had the existing statutes and rules in view, and did not intend to supersede or interfere with them."

I do not understand by this expression of opinion by Judge O'Brien that he meant that no change can be made in existing statutes and rules, but simply that they were continued in force, and applied to all departments of the public service. Undoubtedly, changes can be made in them that do not violate the principle involved in the amendment, or that do not conflict with other portions of the constitution,—as, for instance, the number three, from which the appointing power must select, could probably be enlarged, because that would not conflict with the civil service amendment of the constitution; but that rule could not be changed so as to limit the selection to one, because that, as we have seen, would nullify the appointing power, by depriving it of all discretion and power of selection of choice, and such a nullification of the appointing power is not necessary to carry into effect section 9 of article 5 of the constitution.

We have, then, this condition confronting us: Decisions by the court of last resort in the state holding that certain laws and rules in relation to the civil service, passed prior to the amendment, are in harmony with the civil service amendment to the constitution, and that such amendment was adopted with reference to such statute and rules, and relying upon them to carry it into effect. And such statutes and rules, so in harmony with such amendment and its principle, permit the exercise of discretion, and preserve the power of selection in the choice of the person to be appointed, by the appointing power,—a limited and restricted discretion and power of selection, it is true, but some discretion and some power. On the other hand, a statute which compels the selection of the person graded highest

by persons other than the appointing power or officer,—a statute which is not needed in order to carry into effect either the letter or spirit, or to enforce the principle, of the civil service amendment to the constitution, and which is in absolute conflict with those sections of the constitution containing grants of the appointing power. To hold such a statute valid is to fail to give any effect to such sections. It is a rule of construction that we should not so construe a statute or constitution as to lead to unreasonable or absurd conclusions. And to hold that the power of appointment conferred by section 2 of article 10, and other sections of the constitution, is nullified by section 9 of article 5, is to reach an unreasonable and absurd conclusion, particularly when effect can be given to both, and the principle involved in each carried into effect. I conclude, therefore, that full force and effect must be given to that portion of section 2 of article 10 of the constitution granting the appointing power, and the laws passed pursuant thereto, except as the same may be necessarily limited by section 9 of article 5; that chapter 370 of the Laws of 1899, and the rules passed in pursuance thereof, are, in so far as they compel the appointment of the person graded highest on the eligible list, in direct conflict with, and a nullification of, the power of appointment conferred by section 2 of article 10, and fail to give such section any substantial effect; and that such portion of the statute and rules are not necessary to carry into effect either the letter or spirit of section 9 of article 5, nor to enforce the principle involved in such section, and are to that extent unconstitutional and void. It follows, therefore, that those portions of the civil service rules of the city of Binghamton which provide for the certification by the board of civil service commissioners to the officer having the power of appointment "of the three persons having the highest standing upon the eligible list. And the appointing officer shall therefore appoint to the vacant position, one of the three persons so certified to him,"—have not been abrogated or repealed by the provisions of chapter 370 of the Laws of 1899, but are in full force and effect. And it again follows that the board of street commissioners are at liberty to select either of the two veterans certified to them by the civil service commissioners, and that the order granting the writ of peremptory mandamus, directing the defendants to appoint the relator to the office of superintendent of streets and city property, should be reversed. All concur, except PUTNAM, J., not voting, and LANDON, J., dissenting.

Order reversed, with $10 costs and disbursements, and motion denied, with $10 costs.

LANDON, J. (dissenting). In construing section 9 of article 5 of the constitution, so far as needful here, I think it is only necessary to read its plain words. They seem to me to import that "merit and fitness" can be ascertained to some extent by examinations; that, to the extent that it is practicable thus to ascertain "merit and fitness," it must be done. The legislature is required to provide for the enforcement of the section. Thus, the legislature is required to prescribe the extent to which it is practicable to ascertain "merit and fitness" by examinations. These examinations must be competitive,.

"so far as practicable." The legislature must determine how far it is practicable. It should give to the word "competitive" its obvious meaning, and therefore give the preference to the person who "wins out" in the competition. To the extent that the more recent provision of the constitution specifies the tests of eligibility, or permits them to be specified by the legislature, to that extent the earlier provision (section 2, art. 10), giving the power of appointment without specifying such tests of eligibility, must harmonize. And therefore I think the order appealed from should be affirmed.